1  Jeff Le Riche, MO #46557
   (jleriche@cftc.gov)
2  Jo Mettenburg, KS #19423
   (jmettenburg@cftc.gov)
3  Jennifer J. Chapin, MO #50554
   (jchapin@cftc.gov)
4  Peter L. Riggs, MO #57268
   (priggs@cftc.gov)
5  COMMODITY FUTURES TRADING COMMISSION
6  Two Emanuel Cleaver II Boulevard, Suite 300
   Kansas City, MO 64112
7  Telephone: 816-960-7744 (Mettenburg)
   Facsimile: 816-960-7750
8
   Preston DuFauchard, CA # 114795
9  (pdufauch@corp.ca.gov)
   California Corporations Commissioner
10 Alan S. Weinger, CA # 86717
   (aweinger@corp.ca.gov)
11 Deputy Commissioner
   Joyce Tsai CA # 241908
12 Corporations Counsel and Local Counsel to CFTC
   CALIFORNIA DEPARTMENT OF CORPORATIONS
13 1350 Front Street, Room 2034
   San Diego, California 92101
14 Telephone: (619) 525-4043 (Tsai)
   Facsimile: (619) 525-4045
15
16 Attorneys for Plaintiffs
17
18            UNITED STATES DISTRICT COURT
19            CENTRAL DISTRICT OF CALIFORNIA
20                  WESTERN DISTRICT
21 UNITED STATES COMMODITY          Case No. CV11 02163 GHK (PLAx)
   FUTURES TRADING
22 COMMISSION, and THE
   COMMISSIONER OF                  CONSENT ORDER OF PERMANENT
23 CORPORATIONS OF THE STATE        INJUNCTION AND OTHER
   OF CALIFORNIA,                   EQUITABLE RELIEF AGAINST
24                                  DEFENDANT RICHARD CARTER
                Plaintiffs,
25
26              vs.
27 THE TRADE TECH INSTITUTE,
   INC., TECHNOLOGY TRADING
28 INTERNATIONAL, INC.,
   RICHARD CARTER, AND

FILED
CLERK U.S. DISTRICT COURT

FEB 2 9 2012

CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

ROBERT SORCHINI (AKA "JACK GOLD AND" AND "FRANK THOMAS"),

               Defendants.

## I.    INTRODUCTION

On March 15, 2011, the U.S. Commodity Futures Trading Commission ("CFTC" or "Commission") filed its Complaint for Injunctive Relief, Civil Monetary Penalties, and Other Equitable Relief ("Complaint") (Docket No. 1) in the above-captioned action against defendant Richard Carter ("Carter") and others, in which the CFTC seeks injunctive and other equitable relief for violations of the Commodity Exchange Act ("Act"), 7 U.S.C. § 1 *et seq.* (2006) and Commission Regulations ("Regulations"), 17 C.F.R. §§ 1.1 *et seq.* (2011). The Court entered an Order Granting CFTC's *Ex Parte* Emergency Application for Statutory Restraining Order on March 15, 2011 (Docket No. 3) and a Consent Order of Preliminary Injunction and for Other Equitable Relief Against Defendant Richard Carter on March 31, 2011 (Docket No. 39).

## II.    CONSENTS AND AGREEMENTS

To effect settlement of the matters alleged in the Complaint in this action without a trial on the merits or any further judicial proceedings, Carter:

1.    Consents to the entry of this Consent Order of Permanent Injunction and for Other Equitable Relief Against Defendant Richard Carter (the "Consent Order");

2.    Affirms that he has read and agreed to this Consent Order voluntarily and that no threat or promise has been made by the CFTC or any member, officer, agent, or representative thereof, or by any other person, to induce consent to this Consent Order, other than as set forth specifically herein;

3.    Acknowledges proper service of the summons and Complaint;

Case 2:11-cv-02163-GHK-P

4.  Admits that this Court has jurisdiction over him and the subject matter of this action pursuant to Section 6c of the Act, as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, Title VII, §§701-774, 124 Stat. 1376 (enacted July 21, 2010) (the "Dodd-Frank Act"), to be codified at 7 U.S.C. § 13a-1;

5.  Admits that venue properly lies with this Court pursuant to Section 6c of the Act, as amended by the Dodd-Frank Act, to be codified at 7 U.S.C. § 13a-1;

6.  Waives:

   a.  Any and all claims that he may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (2006) and 28 U.S.C. § 2412 (2006), and/or Part 148 of the Regulations, 17 C.F.R. §§ 148.1, *et seq.* (2011), relating to, or arising from, this action;

   b.  Any and all claims that he may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No.104-121, §§ 201-253, 110 Stat. 847, 857-868 (1996), as amended by Pub. L. No. 110-28, § 8302, 121 Stat. 112, 204-205 (2007), relating to or arising from this action;

   c.  Any claim that he may possess of Double Jeopardy based upon the institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any other relief; and

   d.  Any and all rights of appeal from this action;

7.  Consents to the continued jurisdiction of this Court over him for the purpose of enforcing the terms and conditions of this Consent Order and for any other purpose relevant to this action, even if Carter now or in the future resides outside the jurisdiction;

8.  Agree that neither Carter nor any of his agents or employees under his authority or control shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint or Findings of Fact or Conclusions of Law contained in this Consent Order, or creating, or tending to

1    create, the impression that the Complaint or this Consent Order is without a factual

2    basis; provided, however, that nothing in this provision shall affect Carter's: (i)

3    testimonial obligations; or (ii) right to take legal positions in other proceedings to

4    which the Commission is not a party. Carter shall undertake all steps necessary to

5    ensure that all of his agents and employees under his authority or control

6    understand and comply with this agreement;

7        9.    Agrees to cooperate with Commission staff in the continuing litigation

8    of this matter against any defendant not a party to this Order and other

9    Commission matters. As part of such cooperation, Carter agrees, subject to all

10   applicable privileges, to comply fully, promptly and truthfully to any inquires or

11   requests for information or testimony, including but not limited to, testifying

12   completely and truthfully at any trial or hearing in this or any other Commission

13   action subject to the provisions of paragraph 8, above, or producing written

14   statements or trial declarations to the Commission related to any trial of the subject

15   matter of this or another Commission proceeding;

16       10.    By consenting to the entry of this Consent Order, Carter neither

17   admits nor denies the allegations of the Complaint or the Findings of Fact and

18   Conclusions of Law contained in this Consent Order, except as to jurisdiction and

19   venue, which he admits. However, Carter agrees and intends that the allegations of

20   the Complaint and the Findings of Fact and Conclusions of Law contained in this

21   Consent Order shall be taken as true and correct and be given preclusive effect,

22   without further proof, in the course of: (i) any current or subsequent bankruptcy

23   proceeding filed by, or on behalf of, or against Carter; (ii) any proceeding to

24   enforce this Consent Order; and (iii) any proceeding pursuant to Sections 8a(1)-(2)

25   of the Act, 7 U.S.C. §§ 12a(1)-(2) (2006), and/or Part 3 of the Regulations, 17

26   C.F.R. §§ 3.1 *et seq*. (2011). Carter shall provide immediate notice of any

27   bankruptcy filed by, on behalf of, or against Carter and shall provide immediate

28   notice of any change of address, telephone number, or contact information in the

4

1    manner required by Part VI of this Consent Order; and

2        11.    Agrees that no provision of this Consent Order shall in any way limit

3    or impair the ability of any other person or entity to seek any legal or equitable

4    remedy against him or any other person in any other proceeding.

## III.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

7        The Court, being fully advised in the premises, finds that there is good cause

8    for the entry of this Consent Order and that there is no just reason for delay.  The

9    Court therefore directs the entry of findings of fact, conclusions of law and a

10   permanent injunction and equitable relief, pursuant to § 6c of the Act, as amended

11   by the Dodd-Frank Act, to be codified at 7 U.S.C. § 13a-1, as set forth herein.

### A.    Jurisdiction and Venue

13       12.    This Court has jurisdiction over this action pursuant to Section 6c of

14   the Act, as amended by the Dodd-Frank Act, to be codified at 7 U.S.C. § 13a-1.

15       13.    This Court has personal jurisdiction over Carter, who acknowledges

16   service of the summons and Complaint and consent to the Court's jurisdiction over

17   him.

18       14.    Venue properly lies with this Court pursuant to Section 6c(e) of the

19   Act, 7 U.S.C. § 13a-1(e) (2006), because Carter resides in this District and has

20   transacted business in this District.

### B.    The Parties

22       15.    Plaintiff, the **United States Commodity Futures Trading**

23   **Commission** is an independent federal regulatory agency that is charged by

24   Congress with responsibility for administering and enforcing the provisions of the

25   Act, 7 U.S.C. §§ 1 *et seq.*, and the Regulations promulgated thereunder, 17 C.F.R.

26   § 1.1 *et seq.*

27       16.    **Plaintiff, People of the State of California, by and through the**

28   **California Corporations Commissioner,** is a party to this action on behalf of the

5

1  people of California in the public interest.  The Commissioner, as head of the

2  California Department of Corporations, is empowered by legislative enactment to

3  protect the people of California from unlawful commodity and securities

4  transactions and activities.

5      17.    Defendant **Richard Carter** is a resident of Torrance, California.

6  Carter, along with another, managed the day to day operations of Trade Tech and

7  Tech Trading.  Carter has never been registered with the Commission in any

8  capacity.

9      **C.    Factual Background**

10         **i.    Trade Tech and Tech Trading Operations**

11     18.    Since at least 2007 and continuing through the present (the "Relevant

12  Period"), Trade Tech, by and through Carter, individually and as an agent of Trade

13  Tech, and other Trade Tech employees and agents, engaged in the fraudulent

14  promotion of and selling to the public of several systems ("Systems") to be used

15  for trading commodity futures contracts ("Futures") and options on commodity

16  futures contracts ("Options") in managed accounts.

17     19.    Beginning in April 2010, Carter, individually and in his capacity as an

18  agent, and others, continued the fraudulent promotion of and selling to the public

19  Systems through a new entity formed for that purpose: Tech Trading.

20     20.    During the Relevant Period, Trade Tech and Tech Trading operated as

21  CTAs in that they were engaged in the business of providing advice to clients and

22  prospective clients (collectively, "Clients") as to the value or advisability of

23  trading Futures and Options by, *inter alia*, soliciting the general public to purchase

24  at least eight different purportedly automated Systems and by using the Systems to

25  generate trading recommendations available to Clients who open managed

26  accounts.

27     21.    Carter was a controlling person of Trade Tech and Tech Trading.

28  Carter did not act in good faith and knowingly induced, directly or indirectly, the

1  acts constituting Trade Tech's and Tech Trading's violations of the Act and

2  Regulations.

3                        a.      **The Systems**

4       22.     The Systems that Trade Tech and Tech Trading offered and sold to

5  Clients generated trading signals for various Futures and Options contracts.

6  Clients opened managed accounts to receive these signals.  These signals were

7  communicated by Trade Tech and Tech Trading, as trading orders, to the

8  introducing broker ("IB") firms where Clients' managed accounts were held, either

9  by instant message or automatically through a computerized trading platform

10  called Trade Station.

11       23.     Trade Tech offered for sale to Clients the following Systems:  Trade

12  Tech Analytics ("TTA"), Paradigm, Optimum, Expeditor, MAC, Hybrid, Daytona

13  and Pioneer.

14       24.     Tech Trading offered for sale to Clients the following Systems:

15  Prisma, Millennium, and X-Ray Trading.

16       25.     Each of the Systems sold by Trade Tech and Tech Trading was

17  developed by one of three individuals that worked for Trade Tech and Tech

18  Trading (the "Developer(s)").  The majority of the Systems sold by Trade Tech

19  and Tech Trading were created at the request of Carter or another person.

20       26.     Prior to Trade Tech or Tech Trading marketing a System, the

21  Developers "back-tested" their respective Systems, which means they applied the

22  trading strategy of their Systems against known historical trading data.  As part of

23  this process, the Developers optimized their Systems to take advantage of past

24  trading patterns and trends.  Back-testing involves no actual trading.

25       27.     Live trading for any particular System occurred only after the first

26  Client purchased a System, opened and funded a managed trading account, and

27  authorized that System to generate trading signals that were used by the IB to

28  execute trades in the Client's managed account.

1      28.    Generally, each of the Systems sold by Trade Tech and Tech Trading

2 was marketed for only a few months.  This is because Trade Tech and Tech

3 Trading would stop selling a System after that System began generating trading

4 losses in Clients' accounts, resulting in numerous Client complaints, which usually

5 occurred within a few months of Trade Tech and Tech Trading marketing a

6 System.  When this occurred, Carter and others directed the Developers to create a

7 new System for marketing to Clients.

8              **b.**     **Trade Tech and Tech Trading Sales Force**

9      29.    Trade Tech and Tech Trading advertised the Systems through their

10 respective websites and through telemarketing.

11      30.    Trade Tech and Tech Trading salespeople, whose roles are described

12 within the two companies as "Openers" (described below) and "Closers"

13 (described below), received between $350 and $500 for each System that they

14 sold.

15              **c.**     **The Sales Process**

16      31.    Trade Tech and Tech Trading acquired sales leads by purchasing lists

17 of telephone numbers of people residing throughout the United States.  These

18 phone numbers were loaded into automatic dialers that routed calls to Trade Tech

19 and Tech Trading salespeople.

20      32.    Clients were initially contacted by Trade Tech and Tech Trading

21 salespeople referred to as Openers.  Openers were provided scripts to read when

22 calling Clients that contain, among other things, information about the purported

23 past and potential future profitability of the Systems.

24      33.    When a Client showed interest in a System, the Client was turned over

25 to Trade Tech or Tech Trading salespeople referred to as Closers.

26      34.    Closers provided additional information to Clients about the Systems'

27 purported past and potential future profitability, the performance-based guarantees

28 available with the Systems and the purchase price of the Systems.  In addition,

1    Closers directed Clients to Trade Tech's or Tech Trading's website and showed
2    Clients the Systems' various track records (the "Track Records").

3        35.    Closers were authorized to sell the Systems for between $4,995 and
4    $9,995.

5        36.    In addition, Closers were authorized to offer performance-based
6    guarantees with the Systems.  Typically, these guarantees were based on the net or
7    gross performance of a System over six months, one year, or two years.

8        37.    After a Client agreed to purchase a System, Trade Tech and Tech
9    Trading arranged for the Client to open a managed account at one of at least four
10   IBs.  These IBs, in turn, introduced the Client to a Futures Commission Merchant.

11       38.    In connection with their managed accounts, Clients executed letters of
12   direction to one of the IBs, directing that the IB execute trades in the Client's
13   account pursuant to trading signals generated by the Systems purchased by the
14   Client.  Thus, after letters of direction were in effect, trading pursuant to the
15   Systems occurred  automatically in Clients' accounts unless and until a Client
16   instructed his or her IB to cease trading in his or her managed accounts pursuant to
17   the System, or until the Client's funds were exhausted.

18          **ii.**    **Trade Tech's and Tech Trading's Fraudulent Conduct**

19       39.    As part of regular business operations: (1) Trade Tech and Tech
20   Trading made fraudulent misrepresentations about the Systems' purported past and
21   potential future profitability and Track Records; (2) Trade Tech and Tech Trading
22   failed to adequately warn of risks inherent in trading Futures and Options; (3)
23   Trade Tech and Tech Trading made fraudulent misrepresentations and omissions
24   regarding the Systems' performance in Clients' managed accounts; (4) Trade Tech
25   and Tech Trading offered fraudulent performance-based guarantees; (5) Trade
26   Tech switched Clients into Systems Clients did not purchase without informing the
27   Clients or obtaining their consent; and (6) Trade Tech posted a misleading Client
28   testimonial on its website that does not contain required disclosures.

### a. Misrepresentations Regarding the Systems' Purported Past and Potential Future Profitability and Track Records

40.     During the sales solicitation process, Trade Tech's and Tech Trading's salespeople misled clients in a variety of ways about the Systems' past and potential future profitability and Track Records.

41.     First, Trade Tech and Tech Trading salespeople made false oral representations to Clients about the Systems' past and potential future profitability. Second, to buttress their claims of the Systems' past and potential future profitability, Trade Tech and Tech Trading salespeople showed and discussed with Clients the Systems' various Track Records. During these discussions, Trade Tech and Tech Trading salespeople misrepresented to Clients that the data underlying these Track Records represented actual trading results. Third, the Track Records misrepresented the Systems' overall profitability.

### b. Baseless and False Representations Regarding the Systems' Purported Past and Potential Future Profitability

42.     During telephone calls with Clients, Trade Tech and Tech Trading salespeople painted rosy pictures of the Systems' purported past and potential future profitability, telling Clients that the Systems would yield and had yielded returns ranging between 10% and 20% per month.

43.     Trade Tech and Tech Trading published on their respective websites the Systems' Track Records, which display the various Systems' purported performance.

44.     Each System had its own respective web page displaying its Track Record. The Systems' Track Records are subdivided by portfolio and generally contained between one year and two years' worth of purported trading results.

45.     During sales calls, Trade Tech and Tech Trading salespeople directed Clients to the portions of the Trade Tech and Tech Trading websites that published

1 | the Track Records to view the Systems' purported performance.

2 |   46. When discussing the Track Records with Clients during sales calls,

3 | Trade Tech and Tech Trading salespeople made misleading and false

4 | representations concerning the nature of the trading results displayed in the Track

5 | Records. For example, Trade Tech and Tech Trading salespeople told Clients that

6 | the Track Records:

7 |    a. were based on "live" trading;

8 |    b. were actual trades that had occurred in other Clients' accounts; and

9 |    c. were reflective of what Clients could expect to earn in their

10 |     accounts.

11 |   47. These statements about the Track Records containing actual trading

12 | results or being reflective of "live" trading were false and misleading. The

13 | overwhelming majority of trading results displayed in the Track Records are, in

14 | fact, back-tested trading results and not live trading results.

15 |   48. Before a System was sold, the Track Records contained only back-

16 | tested trading results. When live-trading began, Trade Tech and Tech Trading

17 | amended the Track Records to include live-trading results. These live-trading

18 | results, however, do not include commissions or other fees charged in Clients'

19 | managed accounts.

20 |   49. Because the Systems were not traded live until purchased by Clients,

21 | there are no, or very little, live-trading results on display in the Track Records to

22 | share with Clients during the time period in which Trade Tech and Tech Trading

23 | were marketing any particular System.

24 |   50. In the instances where the Track Records contain live trading results,

25 | Trade Tech and Tech Trading salespeople further misled Clients by omitting to tell

26 | them what portions of the Track Records reflect live-trading and what portions of

27 | the Track Records reflect back-testing.

28 |   51. Trade Tech and Tech Trading salespeople also misled some Clients

1  about the "hypothetical" nature of the data contained in the Track Records

2      52.    The statements about the "hypothetical" nature of the Track Records

3  were false and misleading because they create the impression that live-trading had

4  occurred, in another Client's account using the Systems, to generate all the trading

5  results displayed in the Track Records.  In fact, the Track Records are hypothetical,

6  but not for the reasons suggested by Trade Tech and Tech Trading.  The Track

7  Records are hypothetical because they are based, largely (and depending when

8  viewed by the Client, exclusively), on back-tested trading results.

9
               **c.**    **The Track Records Misrepresent the Overall**

10                      **Profitability of the Systems**

11      53.    The Track Records indicate that, overall, the Systems were

12  consistently generating profitable trades and had amassed significant trading gains

13  over time.

14      54.    In fact the majority of the Systems' live-trading resulted in primarily

15  unprofitable trades and the vast majority of Clients lost money trading pursuant to

16  the Systems.

17      55.    The Track Records misrepresent and overstate the overall profitability

18  of the Systems because the Track Records are comprised primarily of back-tested

19  trading results.

20      56.    Generally, the back-tested trading results on display in the Track

21  Records are highly profitable while the live-trading results on display in the Track

22  Records are unprofitable.  When the back-tested trading results are displayed with

23  the live-trading results, the Systems appear profitable, overall, even though the

24  live-trading results are mostly unprofitable.

25      57.    The Track Records are also misleading because none of the trading

26  results displayed in the Track Records account for commissions or any other

27  transaction fees that are charged to Clients' managed accounts.  This omission also

28  has the effect of overstating the overall profitability of the Systems in the Track

1    Records.

2        58.    The following are examples of how the Track Records, published on

3    Trade Tech's and Tech Trading's websites, misrepresent the overall profitability of

4    the Systems:

5            a.   The Mac Track Record (as it was published on November 19,

6                 2010) states that as of October 31, 2010, Mac has generated gross

7                 profits of $142,655.89 on a $15,000 investment over 26 months (or

8                 an average monthly profit of $5,486.76).  In fact, the Mac Track

9                 Record contains 13 months of back-tested trading results, which

10               yield $149,355,00 in gross profits (or an average monthly profit of

11               $11,488.85) and 13 months of live trading results, which yield

12               $6,699.11 in gross losses (or an average monthly loss of $515.32).

13               None of the trading results displayed in the Mac Track Record

14               include commissions or other fees charged in trading accounts,

15               which, if included, would further increase live trading losses.

16          b.   The Prisma Track Record (as it was published on December 8,

17               2010) states that as of November 30, 2010, Prisma has generated

18               gross profits of $93,991.56 on a $15,000 investment over 24

19               months (or an average monthly profit of $3,916.32).  In fact, the

20               Prisma Track Record contains 18 months of back-tested trading

21               results, which yield $99,856.00 in gross profits (or an average

22               monthly profit of $5,547.56) and six months of live trading results,

23               which yield $5,864.54 in gross losses (or an average monthly loss

24               of $977.42).  None of the trading results displayed in the Prisma

25               Track Record include commissions or other fees charged in trading

26               accounts, which, if included, would further increase live trading

27               losses.

28       59.    The Track Records for the other Systems, published on Trade Tech's

13

1    and Tech Trading's websites, follow a similar pattern to the Mac and Prisma Track

2    Records.

### d.    Misrepresentations and Omissions Concerning Risks of Trading in the Futures and Options Markets

60.    Most of the Trade Tech and Tech Trading salespeople did not have industry experience and salespeople did not receive training on the risks associated with Futures and Options trading.

61.    In many instances, during oral sales solicitations, Trade Tech and Tech Trading salespeople failed to disclose to Clients the risk of loss inherent in trading Futures and Options.

62.    In other instances, Trade Tech and Tech Trading salespeople understated the risk associated in trading Futures by overstating the effect of stop-losses embedded in the Systems.

### e.    Misrepresentations and Omissions Regarding the Systems' Performance in Clients' Managed Accounts

63.    At the same time that Trade Tech and Tech Trading salespeople were painting extremely rosy pictures about the Systems' past and potential future profitability and showing Clients the Systems' highly profitable Track Records, they were failing to disclose to Clients the abysmal performance of Trade Tech's Systems in Clients' managed accounts.

64.    Trade Tech, Tech Trading, and Carter knew the Systems were causing losses in Clients' managed accounts because of, among other things, the following:

a.    The Developers informed Carter and others, on a daily basis, of the Systems' trading results for that day;

b.    Trade Tech and Tech Trading received numerous complaints from Clients regarding the Systems' performance in the Clients' managed accounts; and

c.    Trade Tech used three different Developers in designing the

14

Systems it sold. Carter and others fired and replaced at least two of these Developers due to the abysmal performance of the Systems generated by those Developers.

65.    Trade Tech, as a regular practice, would stop selling a System, or change a System's name, in response to negative feedback it received from its Clients regarding the Systems' performance in Clients' managed accounts. Trade Tech omitted to tell Clients that it had stopped selling particular Systems, or that it had changed the name of particular Systems, in response to negative Client feedback.

### f.    Trade Tech's and Tech Trading's Fraudulent Performance-based Guarantees

66.    Trade Tech and Tech Trading salespeople offered, during the course of their sales solicitations, performance-based guarantees promising the refund of the purchase price of any given System if the System was not profitable over a specified trading period.

67.    Trade Tech and Tech Trading salespeople offered refunds of the purchase price of a System based on the net or gross performance of any given System over a specified trading period. The trading period on which the guarantees were based varied (depending on what the salespeople can negotiate with Clients), but usually spanned between six months and two years.

68.    Clients were eligible to request refunds pursuant to these performance-based guarantees only after permitting the System to make every trade generated by the System in their accounts for the requisite trading period.

### g.    Performance-based Guarantees Downplayed Risk Associated with Systems

69.    Trade Tech's and Tech Trading's performance-based guarantees downplayed the level of risk associated with trading Futures. Specifically, Trade Tech's and Tech Trading's performance-based guarantees, coupled with their

extremely rosy picture of the Systems' past and potential future profitability and highly profitable Track Records, misrepresented the existence of the substantial risks inherent in Futures and Options trading.

70.   Trade Tech and Tech Trading salespeople promoted their performance-based guarantees in a manner that minimized the risks associated with Futures and Options trading pursuant to the Systems.

71.   Additionally, a script was distributed at Trade Tech and read by Trade Tech salespeople during some sales solicitations that states "[i]f the Daytona System isn't Net profitable after a FULL 24 months of trading you will receive a full refund of the entire $7995 that you paid for the Daytona System.  If that happened you still own lifetime access to the system even though we fell short. We have never fallen short before and frankly, we are not starting with you."

### h.   Trade Tech's Refund Process Acted as a Fraud on Clients

72.   In addition to minimizing the risk of loss associated with Futures trading, Trade Tech's performance-based guarantees, as well as the manner in which Trade Tech processed refund requests pursuant to the performance-based guarantees, acted as a fraud on Clients.

73.   In some instances, Trade Tech's performance-based guarantees were completely worthless because the Systems caused trading losses so rapidly that Clients risked losing all their trading capital before they were eligible to pursue a refund.

74.   Although numerous Trade Tech Clients requested refunds pursuant to the performance-based guarantees, Trade Tech often lacked sufficient funds to honor Clients' refund requests in a timely manner.

75.   Trade Tech lulled some Clients who made refund requests by asking these Clients to continue trading their Systems and/or offering these Clients the opportunity to utilize another of Trade Tech's Systems, free of charge, in the

1   Clients' managed accounts.

2       76.    Because this lulling activity caused Clients to trade pursuant to the

3   Systems longer than they otherwise may have, Clients were put at greater risk of

4   losing money in their managed accounts and, as a result, suffered additional

5   trading losses.

6       77.    In addition, Trade Tech salespeople, in response to Clients' requesting

7   refunds, systematically ignored, denied, unreasonably delayed, and/or berated

8   Clients that requested refunds.

9

10      **i.  Trade Tech Switched Clients to a Different System without Clients' Knowledge or Consent**

11      78.    In December 2009, Trade Tech instructed the IBs at which Clients

12  maintained their managed accounts to switch all existing Clients from the System

13  they were trading at that time to Mac.

14      79.    Trade Tech made this switch without informing its Clients and

15  without obtaining the Clients' consent to switch Systems.

16      **j.  Trade Tech's Client Testimonial**

17      80.    On its website, Trade Tech publishes, under the "Testimonial" tab, a

18  Client email, dated June 24, 2009, which states:

19

20      Just a quick note to say that my trading account is up and running and
        active . . . since last Friday, when [my account] started trading, the
21      account has gained a net of $787.50.  Obviously I understand that no
        system has a perfect batting average and there will be losses and dips,

22

23      but this certainly is an excellent start and I'm very impressed and
        pleased with Trade Tech so far. . . . I ended the month at $18,865 up
24      from $16,400 last week.  Hopefully August will continue the
        momentum.

25      81.    With regard to this testimonial, Trade Tech's website did not

26  prominently disclose 1) that the testimonial may not be representative of the

27  experience of other Clients; or 2) that the testimonial is no guarantee of future

28  performance or success.

82.     In reality, the testimonial email contained on Trade Tech's website is not reflective of even this Client's (the testimonial's author) experience with Trade Tech.  Beginning in August 2009, this Client began alerting Trade Tech that the System he purchased (Expeditor) was causing significant losses in his account.  By early October 2009, this Client ceased trading pursuant to this System because of the losses generated by the System in his managed account.  In December 2009, the Client demanded that Trade Tech issue him a refund for the purchase price of the System, which the Client finally received from Trade Tech in July 2010.

### iii.     Carter Controlled Trade Tech and Tech Trading

83.     At both Trade Tech and Tech Trading, Carter was at all times responsible for Trade Tech's and Tech Trading's operations.

84.     Carter's responsibilities included, *inter alia*, managing the merchant accounts, finances, the interviewing and hiring of salespeople, and the hiring and supervision of Developers.

85.     Carter controlled Trade Tech and Tech Trading.  He knowingly induced, directly or indirectly, the acts described above.

### iv.     Carter Actively Participated in the Above-Described Conduct

86.     Carter actively participated in the conduct described in Paragraphs 18-85 by directing, condoning, approving, or facilitating the Trade Tech or Tech Trading employees (including salespeople and Developers) who engaged in the conduct.

### D.     Carter Violated the Act

87.     Trade Tech and Tech Trading acted as CTA's in that, for compensation or profit, they engaged in the business of advising others as to the value or the advisability of trading in Futures.

88.     Trade Tech and Tech Trading, through the acts of their agents and employees, knowingly and/or with reckless disregard for the truth engaged in

1   conduct that violates Sections 4o(1)(A)-(B) of the Act, 7 U.S.C. §§ 6o(1)(A)-(B)

2   (2006), in that, by use of the mails or other means or instrumentalities of interstate

3   commerce, they directly or indirectly employed a device, scheme, or artifice to

4   defraud Clients, and they engaged in transactions, practices or courses of business

5   that operate as a fraud or deceit upon such persons.  The devices, schemes,

6   artifices, transactions, practices or courses of business include, but are not limited

7   to, making false and misleading statements about the purported past and potential

8   future profitability and Track Records of the Systems they sold, failing to

9   adequately warn of the risks inherent in trading Futures and Options, failing to

10  inform Clients of the Systems' abysmal performance in Clients' managed

11  accounts, offering false performance-based guarantees, and switching trading in

12  Clients' managed accounts to a different System without informing Clients of the

13  switch or obtaining their consent.

14      89.     Trade Tech's and Tech Trading's conduct also violated Regulation

15  4.41(a)(1)-(2), 17 C.F.R. § 4.41(a)(1)-(2) (2011), in that as CTAs, they advertised

16  in a manner that employs a device, scheme or artifice to defraud Clients or

17  prospective Clients and involved transactions, practices, or courses of business

18  which operated as a fraud or deceit upon Clients;

19      90.     Trade Tech has violated Regulation 4.41(a)(3), 17 C.F.R. § 4.41(a)(3)

20  (2011), in that, as a CTA, Trade Tech referred to a testimonial on its website

21  without prominently displaying the requisite disclosures.

22      91.     Carter directly or indirectly controlled Trade Tech and Tech Trading,

23  and did not act in good faith, or knowingly induced, directly or indirectly, the acts

24  constituting Trade Tech's and Tech Trading's violations, and is thus liable for

25  Trade Tech's and Tech Trading's violations of Sections 4o(1)(A)-(B) of the Act, 7

26  U.S.C. §§ 6o(1)(A)-(B), and Regulation 4.41(a), 17 C.F.R. § 4.41(a).

27

28

# IV. ORDER FOR PERMANENT INJUNCTION

**IT IS NOW HEREBY ORDERED THAT:**

92. Carter is permanently restrained, enjoined, and prohibited from engaging, directly or indirectly in conduct in violation of Sections 4o(1)(A)-(B) of the Act, as amended by the Dodd-Frank Act, to be codified at 7 U.S.C. §§ 6o(1)(A)-(B); Regulation 4.41(a)(1)-(3), 17 C.F.R. § 4.41(a)(1)-(3); and CCC Section 29536.

93. Carter is permanently restrained, enjoined, and prohibited from directly or indirectly:

    a. trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, as amended by the Dodd-Frank Act, to be codified at 7 U.S.C. § 1a);

    b. entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 1.3(hh), 17 C.F.R. § 1.3(hh) (2011)) (commodity options), security futures products and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i) (Supp. III 2009)) (forex contracts), for his own personal account or for any account in which he has a direct or indirect interest;

    c. having any commodity futures, options on commodity futures, commodity options, security futures products and/or forex contracts traded on his behalf;

    d. controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, security futures products and/or forex contracts;

    e. soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on

1  commodity futures, commodity options, security futures products and/or forex

2  contracts;

3            f.      applying for registration or claiming exemption from

4  registration with the CFTC in any capacity, and engaging in any activity requiring

5  such registration or exemption from registration with the CFTC, except as

6  provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011); and

7            g.      acting as a principal (as that term is defined in

8  Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2011)), agent or any other officer or

9  employee of any person registered, exempted from registration or required to be

10  registered with the CFTC, except as provided for in Regulation 4.14(a)(9), 17

11  C.F.R. § 4.14(a)(9) (2011).

12       94.     The injunctive provisions of this Consent Order shall be binding upon

13  Carter, upon any person who acts in the capacity of officer, agent, servant,

14  employee, or attorney, successor and/or assign of Carter, and upon any person who

15  receives actual notice of this Consent Order, by personal service or otherwise,

16  insofar as he or she is acting in active concert or participation with Carter.

### V.    ORDER OF DISGORGEMENT AND CIVIL MONETARY PENALTY

19       95.     Carter shall comply fully with the following terms, conditions and

20  obligations relating to the payment of disgorgement and a civil monetary penalty.

21  The equitable and statutory relief provisions of this Consent Order shall be binding

22  upon Carter and any person who is acting in the capacity of officer, agent,

23  employee, servant, or attorney of Carter, and any person acting in active concert or

24  participation with Carter.

25       **A.**     **Disgorgement**

26       96.     Carter is hereby ordered to disgorge $992,352.93 ("Disgorgement

27  Obligation"). Post-judgment interest shall accrue on the Disgorgement Obligation

28  beginning on the date of entry of this Consent Order and shall be determined by

1   using the Treasury Bill rate prevailing on the date of this Consent Order pursuant

2   to 28 U.S.C. § 1961(a) (2006).

3       97.    Appointment of Monitor and Collection and Distribution of

4   Disgorgement Obligation:  To effect payment by Carter and distribution of the

5   Disgorgement Obligation, the Court appoints the National Futures Association

6   ("NFA") as Monitor.  The Monitor shall collect all payments from Carter,

7   including the frozen funds identified in paragraph 102, below, and make

8   distributions as set forth below.  Because the Monitor is acting as an officer of the

9   Court in performing these services, the Monitor shall not be liable for any action or

10  inaction arising from its appointment as Monitor, other than actions involving

11  fraud.

12      98.    Carter shall cooperate with the Monitor as appropriate to provide such

13  information as the Monitor deems necessary and appropriate to identify Trade

14  Tech's and Tech Trading's Clients, whom the Monitor, in its sole discretion, may

15  determine to include in any plan for distribution of any payments received.

16      99.    Carter shall make disgorgement payments under this Consent Order in

17  the name of the "Trade Tech and Tech Trading Fund" and shall send such

18  payments by electronic funds transfer, or by U.S. postal money order, certified

19  check, bank cashier's check, or bank money order, made payable to and sent to the

20  Office of Administration, National Futures Association, 300 S. Riverside Plaza,

21  Suite 1800, Chicago, Illinois 60606, under a cover letter that identifies the Carter

22  as a paying defendant and the name and docket number of this proceeding.  Carter

23  shall simultaneously transmit a copy of the cover letter and the form of payment to

24  the Director, Division of Enforcement, United States Commodity Futures Trading

25  Commission, at the following address:  1155 21st Street, N.W., Washington, DC

26  20581, and to the Chief, Office of Cooperative Enforcement, Division of

27  Enforcement, at the same address.

28      100.   The Monitor shall oversee Carter's Disgorgement Obligation and shall

1  have the discretion to determine the manner of distribution of funds in an equitable

2  fashion to Trade Tech and Tech Trading Clients.[1]  In the event that the amount of

3  disgorgement payments to the Monitor are of a *de minimis* nature such that the

4  Monitor determines that the administrative costs of the making a disgorgement

5  distribution is impractical, the Monitor may, in its discretion, treat such

6  disgorgement payments as civil monetary penalty payments, which the Monitor

7  shall forward to the Commission following the instructions for civil monetary

8  penalty payments set forth in Part V.C., below.

9      101.  Nothing herein shall be construed in any way to limit or abridge the

10  rights of any customer or client that exist under federal, state, or common law to

11  assert a claim for recovery against Carter subject to any offset or credit that Carter

12  may be entitled to claim under the law governing that client's or customer's claim.

13  Subsequent to the entry of this Consent Order, Carter shall provide the

14  Commission and the Monitor with immediate notice of any filing or compromise

15  and settlement of any private or governmental actions relating to the subject matter

16  of this Consent Order in the manner required by Part VI of this Consent Order.

17      102.  Frozen Accounts, Transfer of Funds, and Partial Satisfaction of

18  Disgorgement Obligation:  Upon the entry of this Consent Order, the Commission

19  shall promptly provide each of the financial institutions identified in this paragraph

20  with a copy of this Consent Order.  Within thirty (30) days of receiving a copy of

21  this Consent Order, each of the financial institutions identified in this paragraph are

22  specifically directed to liquidate and release any and all funds held by Carter in any

23

24  [1] The CFTC will provide a list of Trade Tech and Tech Trading Clients (the "Trade Tech/Tech Trading Client List")

25  to the NFA should sufficient funds be collected for a distribution by the NFA. The Trade Tech/Tech Trading Client
    List will be compiled by the CFTC based on the information it has available. To the extent additional Clients are

26  omitted from the Trade Tech/Tech Trading Client List, their omission shall not prejudice their right to claim a share
    of the Disgorgement Obligation upon sufficient proof of the same to the Monitor. In the event an omitted Client

27  claims a share of the Disgorgement Obligation, the Monitor shall use its discretion in determining whether such
    omitted Client has made a sufficient showing as to warrant inclusion in any distributions made by the Monitor in full

28  or partial satisfaction of the Disgorgement Obligation.

1    account number identified below and to convey by wire transfer to an account

2    designated by the Monitor, any and all funds contained in those accounts, less any

3    amounts required to cover the banks' outstanding administrative or wire transfer

4    fees. The transfer of such funds shall satisfy in part the Disgorgement Obligation

5    identified in paragraph 96. At no time during the liquidation, release and/or wire

6    transfer of these funds pursuant to this Consent Order shall Carter be afforded any

7    access to, or be provided with, any funds from these accounts. Carter, as well as

8    all banks and financial institutions listed in this Consent Order, shall cooperate

9    fully and expeditiously with the Commission and Monitor in the liquidation,

10   release and wire. The accounts to be liquidated, released and transferred are:

11        a.  Account XXX XX X9209 in the name of Carter at Peregrine

12            Financial Group Inc.; and

13        b.  All accounts held by, or on behalf of, or in the names of Carter or

14            Matrix Trading Solutions, Inc. at Wells Fargo Bank NA, including,

15            but not limited to, the following accounts:  XXX-XX5822,

16            XXXXXX9587, XXX-XXX9909, XXXXXX2365,

17            XXXXXX5928, and XXX-XXX7471;

18   103.  Accrual of Funds to U.S. Governmental Entities:  To the extent that

19   any funds accrue to any U.S. governmental entity, including but not limited to the

20   U.S. Treasury, as a result of the Disgorgement Obligation, such funds shall be

21   transferred to the Monitor for disbursement in accordance with the procedures set

22   forth in this Part V of the Consent Order.

23        **B.    Civil Monetary Penalty**

24   104.  Pursuant to Section 6c(d)(1) of the Act, as amended by the Dodd-

25   Frank Act, to be codified at 7 U.S.C. § 13a-1(d)(1), and Regulation 143.8(a)(1)(i),

26   17 C.F.R. § 143.8(a)(1)(i) (2011), this Court may impose an order directing Carter,

27   to pay a civil monetary penalty ("CMP"), to be assessed by the Court, in amounts

28   of not more than the greater of (1) triple the monetary gain to Carter for each

1 violation of the Act and Regulations; or (2) $130,000 for each violation of the Act

2 and Regulations occurring from October 23, 2004 through October 22, 2008, and

3 $140,000 for each violation of the Act and Regulations occurring on or after

4 October 23, 2008.

5     105. In determining the amount of the CMP to be paid by Carter, the Court

6 has considered the egregiousness, duration, and scope of the violations of the Act.

7 A proper showing having been made, Carter is hereby assessed total CMP in the

8 amount of $496,176.46, plus post-judgment interest. Carter shall pay this CMP

9 within ten (10) days of the date of entry of this Consent Order. Should Carter not

10 satisfy this CMP within ten (10) days of the date of entry of this Consent Order,

11 post judgment interest shall accrue on this CMP beginning on the date of entry of

12 this Consent Order and shall be determined by using the Treasury Bill rate

13 prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961.

14     106. Carter shall pay the CMP by electronic funds transfer, U.S. postal

15 money order, certified check, bank cashier's check, or bank money order. If

16 payment is to be made by other than electronic funds transfer, the payment shall be

17 made payable to the United States Commodity Futures Trading Commission and

18 sent to the address below:

19
20
               Commodity Futures Trading Commission
                    Division of Enforcement

21          ATTN: Accounts Receivables – AMZ 340
         E-mail Box: 9-AMC-AMZ-AR-CFTC

22                      DOT/FAA/MMAC
23                  6500 S. MacArthur Blvd.
               Oklahoma City, OK 73169

24               Telephone: (405) 954-5644

25 If the payment is to be made by electronic funds transfer, contact Linda Zurhorst ,

26 or her successor, at the above address for payment instructions, and shall fully

27 comply with those instructions. Carter shall accompany the payment of the CMP

28 with a cover letter that identifies Carter as the paying defendant and the name and

docket number of this proceeding. Carter shall simultaneously transmit copies of the cover letter and the form of payment to the Director, Division of Enforcement, United States Commodity Futures Trading Commission, Three Lafayette Center, 1155 21st Street, N.W., Washington, DC 20581; and to the Chief, Office of Cooperative Enforcement, Division of Enforcement, at the same address.

### C. Provisions Related to Monetary Sanctions

107. Satisfaction: Upon full satisfaction of the Disgorgement Obligation and CMP, satisfaction of judgment will be entered as to Carter.

108. Partial Satisfaction: Any acceptance by the CFTC and/or Monitor of partial payment of the Disgorgement Obligation or CMP obligation ordered in this Consent Order shall not be deemed a waiver of the Carter's requirement to make further payments pursuant to this Consent Order, or a waiver of the CFTC's right to seek to compel payment of any remaining balance.

## VI.   MISCELLANEOUS PROVISIONS

### IT IS FURTHER ORDERED THAT:

109. Upon execution of this Consent Order by the Court, the asset freeze in the Order Granting Plaintiff's Ex Parte Emergency Motion for Statutory Restraining Order (Docket No.3) and the Consent Order of Preliminary Injunction and for Other Equitable Relief Against Defendant Richard Carter (Docket No. 39) is lifted and shall have no further force and effect with respect to all of Carter's accounts, with the exception of those accounts described in paragraph 102 of this Consent Order.

110. Notice: All notices required to be given by any provision in this Consent Order shall be sent certified mail, return receipt requested, as follows:

Notice to CFTC:

Division of Enforcement

U.S. Commodity Futures Trading Commission

Two Emanuel Cleaver II Blvd., Suite 300

Kansas City, MO 64112-1764

All such notices to the CFTC shall reference the name and docket number of this action.  Notice to Carter shall be as follows:

Richard Carter

2931 W. 227th Street

Torrance, CA 90505

111.    Change of Address/Phone:  In the event that Carter changes telephone number(s) and/or address(es) at any time, Carter shall provide written notice of the new number(s) and/or address(es) to the CFTC within ten (10) calendar days thereof.

112.    Entire Agreements and Amendments:  This Consent Order incorporates all of the terms and conditions of the settlement among the parties hereto.  Nothing shall serve to amend or modify this Consent Order in any respect whatsoever, unless: (1) reduced to writing; (2) signed by all parties hereto; and (3) approved by order of this Court.

113.    The equitable relief provisions of this Consent Order shall be binding upon Carter and any person who is acting in the capacity of officer, agent, employee, servant, or attorney of Carter, and any person acting in active concert or participation with Carter who receives actual notice of this Consent Order by personal service or otherwise.

114.    Invalidation:  If any provision of this Consent Order or if the application of any provisions or circumstances is held invalid, the remainder of the Consent Order and the application of the provisions to any other person or circumstance shall not be affected by the holding.

Case 2:11-cv-02163-GHK-PLA

115.   Waiver:  The failure of any party hereto at any time or times to require performance of any provision hereof shall in no manner affect the right of such party at a later time to enforce the same or any other provision of this Consent Order.  No waiver in one or more instances of the breach of any provision contained in this Consent Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Consent Order.

116.   Continuing Jurisdiction of this Court:  This Court shall retain jurisdiction of this case to assure compliance with this Consent Order and for all other purposes related to this action, including any motion by Carter to modify or for relief from the terms of this Consent Order.

117.   Counterparts and Facsimile Execution:  This Consent Order may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered (by facsimile or otherwise) to the other party, it being understood that all parties need not sign the same counterpart.  Any counterpart or other signature to this agreement that is delivered by facsimile or otherwise shall be deemed for all purposes as constituting good and valid execution and delivery by such party of this Consent Order.

1    There being no just reason for delay, the Clerk of the Court is hereby

2  directed to enter this *Consent Order of Permanent Injunction and Other Equitable*

3  *Relief Against Defendant Richard Carter*.

4    **ORDERED AND ADJUDGED.**

5    **DONE AND ORDERED** at Los Angeles, California, this day of

6  ____, 2012.

7

8

9    _____

10   HON. GEORGE H. KING
     UNITED STATES DISTRICT JUDGE
11   CENTRAL DISTRICT OF CALIFORNIA

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3   _____              _____
4   Richard Carter                           Jo E. Mettenburg
    Defendant                                Peter L. Riggs
5                                            U.S. Commodity Futures Trading
6                                            Commission
    Date: _____, 2012             Division of Enforcement
7                                            Two Emanuel Cleaver II Blvd.
8                                            Suite 300
9                                            Kansas City, MO  64112
                                             (T)  (816) 960-7744 (Mettenburg)
10                                           (T)  (816) 960-7748 (Riggs)
11                                           (F)  (816) 960-7750
12                                           jmettenburg@cftc.gov
13                                           priggs@cftc.gov
14
15                                           Date:  February 14, 2012
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3   _____

Richard Carter
4   Defendant

5
6   Date: JAN. 1 9rd, 2011

7

Jo E. Mettenburg
Peter L. Riggs
U.S. Commodity Futures Trading
Commission
Division of Enforcement
Two Emanuel Cleaver II Blvd.
Suite 300
Kansas City, MO 64112
(T) (816) 960-7744 (Mettenburg)
(T) (816) 960-7748 (Riggs)
(F) (816) 960-7750
jmettenburg@cftc.gov
priggs@cftc.gov


Date: _____, 2011

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

30

Jan Lynn Owen
California Corporations
Commissioner
Alan S. Weinger
Deputy Commissioner
Joyce Tsai, CA BAR NO. 241908
Corporations Counsel
1350 Front Street, Room 2034
San Diego, CA 92101
Phone: (619) 525-4043
Fax: (619) 525-4045

Date:  February 21, 2012